[No. 22154-0-I. Division One. November 13, 1989.]

DALE DAN PETERSON, *Respondent,* v. R.B. LITTLEJOHN, ET AL, *Appellants.*

2

*Richard L. Andrews, City Attorney,* and *David Kahn, Assistant,* for appellants.

*David Allen, Richard Hansen,* and *Donald Roistacher,* for respondent.

COLE, J.*—The City of Bellevue and R.B. Littlejohn and his wife appeal the entry of a judgment against them for the malicious prosecution of the respondent Dale D. Peterson. Peterson has filed a cross appeal, challenging the trial court's pretrial dismissal of his claim for violation of his civil rights. We affirm the trial court in all respects except its dismissal of the civil rights claim.

On June 28, 1984, a 14–year–old female hitchhiker in Bellevue was picked up by a man in a tan pickup truck. The man agreed to take her to Skate King, but drove past and voiced his intention of raping her. She jumped from the moving vehicle and made her way to Skate King. The next day she reported the incident to Bellevue Police Detective Littlejohn with whom she was previously acquainted. At trial the victim said she was testifying to help Littlejohn, a defendant.

In her initial interview with Littlejohn on June 29, 1984, the victim described the perpetrator as having acne bumps and a scar on his right eyebrow. These marks were referred to in investigative reports and the composite drawing of the suspect prepared by Littlejohn.[1] The victim further

---

*Judge W.R. Cole is serving as a judge pro tempore of the Court of Appeals pursuant to RCW 2.06.150 and CAR 21(c).

[1] At trial the victim testified that she told Littlejohn the acne resembled "moon craters" and looked as if someone had "stuck him with a pencil" but that

4

described the perpetrator as a bearded, white male, age 40, weighing 200 pounds and 6 feet 2 inches tall. The suspect's vehicle was described as a beat–up, tan pickup without a tailgate, of mid–1970's vintage. The victim also described the interior of the truck and the offender's clothing in some detail. A composite drawing of the suspect was then sent to the police for use in apprehending the perpetrator.

On June 30, 1984, plaintiff Dale Peterson and his girl friend were observed by Bellevue police while driving Peterson's red Volkswagen in Bellevue. Noting Peterson's similarity to the composite drawing, the officer stopped Peterson for a traffic violation. The officer contacted Littlejohn and, at his direction, prepared a field interview report (FIR) card on Peterson and released him. The FIR investigation disclosed that Peterson was "presently out on bail on a rape charge in Pierce County".[2]

Littlejohn contacted Peterson who voluntarily came to the Bellevue police station on July 10, 1984, so that his photo could be taken. According to his deposition testimony of January 1986, when viewing Peterson in person on July 10 Littlejohn saw no evidence of any acne and failed to look for the scar in the eyebrow, because "it didn't cross my mind at the time." On July 11 a photo montage including a photo of Peterson which shows no evidence of acne or scarring was shown to the victim.

she did not remember when she so described it. She stated that she did not describe the acne as a rash. It was Littlejohn's contention throughout trial that he reasonably believed that a skin condition as benign as sunburn would have met the victim's description of "acne".

[2]The pending charge of statutory rape and indecent liberties against Peterson arose out of a custody dispute with his former wife. The ex–wife had filed the charges against him as to a stepdaughter regarding events allegedly occurring 4 years earlier. A bench warrant had issued from Lewis County in April 1984 and Peterson was picked up on June 26, 1984, in Pierce County when he applied for a concealed weapon permit for reasons related to his work. Peterson had been released on his own recognizance on $5,000 bail the same day. The Lewis County charge was subsequently dismissed for lack of evidence.

Upon viewing the montage, the victim picked Peterson as her assailant. She then filled out a form stating that she was able to identify Peterson by the "marks on his face scarred eyebrow and hair." Although Littlejohn knew that Peterson, personally and in his photo, showed no sign of a scar or acne, he did not question the victim regarding her stated reasons for selecting Peterson.

Based on the photo identification, Littlejohn arrested Peterson on July 12. Excluding the weekend, charges had to be filed or Peterson released by July 17, 1984. The case was assigned to prosecutor Rebecca Roe who prepared the necessary paperwork for filing the charge. Roe then asked prosecutor Kathy Goater to verify that Peterson had acne and a scar on his eyebrow consistent with the victim's description. Goater called Littlejohn on July 17 and asked him to go to the jail and verify those matters. Goater testified as follows:

A. I talked with Detective Littlejohn on the telephone and told him that we had to confirm whether or not the defendant had two identifying features; Mr. Peterson. I called him the defendant. That's the way I talk, being in criminal work, and asked whether or not he would have these two identifying features, and asked Detective Littlejohn to go to the King County Jail and take a look at him and tell me whether or not he had a scar on his eyebrow and had acne.

Detective Littlejohn responded that he did not need to do that. He stated that he had been—I believe he indicated he had been involved in the booking process, which is actually the arrest and taking someone into jail and the mechanics you go through in booking someone into jail, and had already looked at the suspect in this case, Mr. Peterson.

Q. And what did he say about Mr. Peterson?

A. He told me Mr. Peterson had acne, and he also told me that he did not per se have a scar in his eyebrow but he described to me that in his eyebrow there was a mark across his eyebrow where the hair of his eyebrow grew together at different angles leaving a mark through the eyebrow, except, I guess, by his hair growth that would be mistaken for a scar."

As a result of that confirmation, the charges were filed on July 17, 1984. Bail was set at $50,000 and Peterson

remained incarcerated until bail was reduced on August 9, 1984.

On July 17, Goater and Littlejohn interviewed the victim. Goater's notes, which she began taking midway through the interview, reflect that the victim described the eyebrow scar as fairly major: "She indicated it appeared to be a burnt mark as if part of the eyebrow had been burned away and that half of the eyebrow was missing." Littlejohn was present but said nothing about the absence of any scar on Peterson's eyebrow.

In addition, Goater testified to her substantial concern that Peterson had never been linked to a tan pickup. On July 26, 1984, Littlejohn had the composite drawing of the suspect published in an eastside newspaper. A Redmond teenager testified that the picture strongly resembled a man for whom she used to babysit who had bad acne and drove an off–white pickup. She contacted Littlejohn who came to her home to interview her and her mother. Littlejohn did not take written statements from either woman. However, he was able to identify the man by name and to acquire a driver's license picture from the Department of Licensing (DOL). The picture strongly resembles the composite drawing and even appears to show scarring on the right eyebrow.

This DOL photo was never shown to the victim because Littlejohn felt that it "didn't look anything like the description we had from [the victim], or anything like Mr. Peterson, or anything like the composite drawing . . ." He also emphasized that the DOL information showed the man to be much younger than the alleged perpetrator (26 rather than 40 to 45) and considerably shorter (5 feet 9 inches rather than 6 feet 2 inches).

At the prosecutor's insistence, Littlejohn agreed to attempt to interview this man. However, he never reported back to her on the results of his attempt. Littlejohn testified that he attempted on seven occasions to contact the man at his home to no avail. Littlejohn also found a tan 1970's vintage pickup with no tailgate and no plates parked

within 100 yards of the Redmond man's home on or about July 27, 1984. He did not impound the vehicle because he didn't feel the suspect was guilty and he didn't feel the pickup sufficiently matched the victim's description. Littlejohn also subsequently saw an off–white pickup parked at the suspect's house with a tailgate on it. This vehicle was seen on September 24 and was the color of the pickup described by the Redmond babysitter. Littlejohn also noted a camper parked at the Redmond residence which, Littlejohn notes in his record, "would require the removal of the tailgate for installation".

At an omnibus hearing in early August, prosecutor Roe noticed that Peterson did not have any acne or eyebrow scar and so noted in her file. In combination with the failure of the City to link Peterson to the tan pickup, Roe was concerned about the validity of the charges. On August 9, 1984, Roe agreed to reduced bail of $5,000 and Peterson was released from custody.

Prosecutor Goater finally saw Dale Peterson on September 13, 1984. She observed that he had no acne, no scar in his eyebrow and no hair pattern in the eyebrow resembling a scar. This viewing of Peterson followed a defense interview of the victim which was attended by Goater. At that interview, the victim described her assailant's acne as "having moon craters, and it looked as though someone had taken a lead pencil and poked him in the face and left black marks all over his face." The victim also indicated again that the suspect "had no eyebrow where he was scarred." It appeared to the prosecutor at this point that the case against Peterson was extremely weak.

On September 28, 1984, a lineup was held. The victim picked two persons, Peterson and another, as people she "recognized, but could not positively identify". Based upon her inability to identify the suspect, the failure to link Peterson with a tan pickup, and Peterson's lack of facial blemishes, the State moved to dismiss the case.

Thereafter, Dale Peterson brought suit against Littlejohn, his marital community, and the City of Bellevue. The

original complaint alleged false arrest, negligent investigation, malicious prosecution, and violation of civil rights under 42 U.S.C. § 1983. Summary judgment was granted dismissing the false arrest claim prior to trial. A jury trial was conducted on the remaining claims. After the plaintiff rested, the court directed a verdict dismissing the § 1983 claim. The negligent investigation claim was not pursued, nor was the jury instructed on that theory, leaving only the malicious prosecution claim at issue.

■■ The jury found for the plaintiff and entered judgment against the defendants in the sum of $115,000. Defendants' motions for judgment n.o.v. and/or a new trial were denied. Defendants' appealed, first contending that the trial court erred in refusing to direct a verdict. We disagree. In determining whether a trial court erred in denying a directed verdict, the appellate court uses the same standard of review as is used by the trial court. *Roberts v. ARCO,* 88 Wn.2d 887, 568 P.2d 764 (1977). That standard of review was articulated by this court in *Mike v. Tharp,* 21 Wn. App. 1, 5, 583 P.2d 654 (1978) (quoting *Reiboldt v. Bedient,* 17 Wn. App. 339, 344, 562 P.2d 991 (1977)):

> A motion for a directed verdict admits the truth of the evidence of the party against whom the motion is made and all inferences that reasonably can be drawn therefrom. In addition, such a motion . . . requires that the evidence be interpreted most strongly against the moving party and in the light most favorable to the opposing party . . . [T]he trial court can grant such a motion only when it can be held as a matter of law that there is no evidence, nor reasonable inference from the evidence, to sustain the verdict.

While actions for malicious prosecution are not favored in law, they will be readily upheld when the proper elements have been established. *Peasley v. Puget Sound Tug & Barge Co.,* 13 Wn.2d 485, 125 P.2d 681 (1942). At page 497, the *Peasley* court sets forth the elements of the cause of action:

> To maintain an action for malicious prosecution, the plaintiff must allege and prove (1) that the prosecution claimed to have been malicious was instituted or continued by the defendant; (2) *that there was want of probable cause for the institution*

*or continuation of the prosecution;* (3) *that the proceedings were instituted or continued through malice;* (4) that the proceedings terminated on the merits in favor of the plaintiff, or were abandoned; and (5) that the plaintiff suffered injury or damage as a result of the prosecution. Of these five elements, malice and want of probable cause constitute the gist of such an action.

(Citations omitted.) Proof of elements (1), (4), and (5) is not at issue herein. Rather, defendants argue that Peterson presented insufficient evidence that Littlejohn lacked probable cause to initiate criminal proceedings against him (element 2) and/or insufficient evidence of "malice" (element 3).

■ In *Bender v. Seattle,* 99 Wn.2d 582, 593–94, 664 P.2d 492 (1983), the court held:

The method of determining probable cause or the lack thereof is set out in *Peasley,* at pages 499–500, as follows:

If it clearly appears that the defendant, before instituting criminal proceedings against the plaintiff, made to the prosecuting attorney a full and fair disclosure, in good faith, of all the material facts known to him, and that the prosecuting attorney thereupon preferred a criminal charge and caused the arrest of the accused, probable cause is thereby established as a matter of law and operates as a complete defense to a subsequent action by the accused. And the same rule prevails where such disclosure was made to a competent practicing attorney, and the criminal prosecution was instituted upon his advice. . . .

*A corollary to this rule is that if any issue of fact exists, under all the evidence, as to whether or not the prosecuting witness did fully and truthfully communicate to the prosecuting attorney, or to his own legal counsel, all the facts and circumstances within his knowledge, then such issue of fact must be submitted to the jury with proper instructions from the court as to what will constitute probable cause, and the existence or nonexistence of probable cause must then be determined by the jury.*

(Citations omitted. Italics ours.)

At the time the prosecutor actually filed charges against Peterson, Littlejohn was specifically asked by Roe, through Goater, whether Peterson had acne and a scar. In the prosecutor's mind, probable cause turned on whether Peterson met the victim's description of the suspect. Littlejohn responded affirmatively to the prosecutor's inquiries on

July 17 although Peterson had neither acne nor the scar. Certainly there was an issue of fact as to whether Littlejohn truthfully communicated all facts within his knowledge to the prosecutor. The trial court did not err in refusing to grant the appellants' motion for a directed verdict in this case. *Bender,* 99 Wn.2d at 594–95.

■ Similarly, Littlejohn's argument that there was insufficient evidence of malice lacks merit. Again, the Supreme Court in *Bender* quotes *Peasley* on this subject:

> As to malice, while it may be inferred from the lack of probable cause, it is not a necessary deduction from this circumstance. As a term of law,
>
>> [m]alice . . . has a broader significance than that which is applied to it in ordinary parlance. The word "malice" may simply denote ill will, spite, personal hatred, or vindictive motives according to the popular conception, but in its legal significance it includes something more. It takes on a more general meaning, so that the *requirement that malice be shown as part of the plaintiff's case in an action for malicious prosecution may be satisfied by proving that the prosecution complained of was undertaken from improper or wrongful motives or in reckless disregard of the rights of the plaintiff.*
>>
>> Impropriety of motive may be established in cases of this sort by proof that the defendant instituted the criminal proceedings against the plaintiff: (1) without believing him to be guilty, or (2) primarily because of hostility or ill will toward him, or (3) for the purpose of obtaining a private advantage as against him. Newell, Malicious Prosecution (1892), 237, § 3; 34 Am. Jur. 728, Malicious Prosecution, § 45; 38 C. J. 421–425, Malicious Prosecution, §§ 60–67; 3 Restatement, Torts (1938), § 668. We have recognized and applied this broader conception of the term in *Waring v. Hudspeth,* [75 Wash. 534, 135 P. 222 (1913)]. Compare *Ladd v. Miles,* [171 Wash. 44, 17 P.2d 875 (1932)].
>
> (Italics ours.) *Peasley,* at 502.

*Bender v. Seattle,* 99 Wn.2d at 594. There was sufficient evidence of reckless disregard of Peterson's rights presented here to send the issue of malice to the jury. *Cf. Turngren v. King Cy.,* 104 Wn.2d 293, 309, 705 P.2d 258 (1985); *Moore v. Smith,* 89 Wn.2d 932, 943–44, 578 P.2d 26 (1978). The trial court did not err in denying the motion for a directed verdict.

 Littlejohn also contends that the trial court erred in not granting his motion for a judgment n.o.v. after the jury found for Peterson. The standards for granting such a motion are set out in *Hojem v. Kelly,* 93 Wn.2d 143, 145, 606 P.2d 275 (1980):

> A motion for a judgment n.o.v. should not be granted unless the court can say, as a matter of law, that there is neither evidence nor reasonable inference therefrom sufficient to sustain the verdict. All evidence must be viewed in the light most favorable to the party against whom the motion is made. There must be "substantial evidence" as distinguished from a "mere scintilla" of evidence, to support the verdict—*i.e.,* evidence of a character "which would convince an unprejudiced, thinking mind of the truth of the fact to which the evidence is directed." A verdict cannot be founded on mere theory or speculation.

(Citations omitted.) *Accord, Brashear v. Puget Sound Power & Light Co.,* 100 Wn.2d 204, 208, 667 P.2d 78 (1983). "An unprejudiced, thinking mind" could have found that Littlejohn's failure to disclose that Peterson lacked acne and a scar justified a determination that his conduct was reckless, rendering initiation of the prosecution malicious. Accordingly, the trial court did not err in refusing to grant judgment n.o.v.

 Defendants next argue that the trial court failed to properly instruct the jury on "probable cause" and "reckless disregard". However, the defendants failed to take exception to the trial court's failure to give their proposed instructions. CR 51 is specific as to the requirements for properly objecting to instructions. Failure to object in such a manner as to enable the trial court to avoid error violates that rule. Where exception is not taken, the alleged error will not be entertained on appeal. *Estate of Ryder v. Kelly–Springfield Tire Co.,* 91 Wn.2d 111, 587 P.2d 160, 16 A.L.R.4th 129 (1978); *Couch v. Mine Safety Appliances Co.,* 107 Wn.2d 232, 244–45, 728 P.2d 585 (1986). Counsel must "make known the action he desires or to which he objects and must state the grounds therefor." *Stuart v. Consolidated Foods Corp.,* 6 Wn. App. 841, 846, 496 P.2d 527 (1972).

Lastly, the defendants contend that the trial court should not have admitted evidence concerning the post-charge investigation of the Redmond suspect because malicious prosecution may be established only by acts which *lead to* the filing of criminal proceedings. They claim evidence of "malicious" or reckless acts taken *after* the filing of charges but while the investigation is continuing is not to be considered as a matter of public policy. Defendants cite no authority for that contention.

■ Elements (1)–(3) of the cause of action, as defined in *Peasley v. Puget Sound Tug & Barge Co., supra,* refer to *both* the *institution* and the *continuation* of the prosecution. The only logical conclusion to be drawn from this language is that malicious prosecution may be established by evidence of *institution* of the proceedings in the proscribed manner *and* by *evidence of continuing* the proceedings in the proscribed manner. Here, there was evidence of both. The manner in which Littlejohn's reckless disregard for Peterson's rights continued after charges were filed contributed to his continued incarceration. This evidence was relevant and was properly admitted by the trial court.

■ The defendants argue that as a matter of public policy police investigations should not be the basis of imposing legal liabilities upon individual officers or police agencies. In Washington sovereign immunity has been abolished and immunity from tort liability for acts taken during criminal investigations has been limited to policy level or "discretionary acts". *Bender,* 99 Wn.2d at 589–90, so held in the context of a malicious prosecution claim based upon defective police investigation:

> Although police investigations and the disclosure of investigation information to the press are of a discretionary nature, we do not view those actions as the type of high level, policymaking decisions of a governmental entity that fall within the rule of discretionary governmental immunity.

While *Bender* did not involve the precise issue of liability for "continuing" a prosecution for malicious reasons and without probable cause, it does state that such conduct is

actionable. Moreover, *Bender* overruled *Clipse v. Gillis,* 20 Wn. App. 691, 582 P.2d 555 (1978), which held that officers conducting a postcharge rape investigation were immune from tort liability. *See also Orwick v. Seattle,* 103 Wn.2d 249, 257, 692 P.2d 793 (1984). The evidence concerning Littlejohn's "continuing" malicious prosecution of Peterson was relevant and its admission was not against public policy.

CROSS APPEAL

Peterson has filed a cross appeal in this case, challenging the trial court's directed verdict on his civil rights cause of action under 42 U.S.C. § 1983. Peterson argues that his constitutional right to be free from malicious prosecution by persons acting under color of law involves the same elements and the same prima facie case as a tort claim for malicious prosecution, citing *Smiddy v. Varney,* 803 F.2d 1469 (9th Cir. 1986). However, the § 1983 claim, unlike the tort, permits recovery of punitive damages against individual defendants where warranted, *Smith v. Wade,* 461 U.S. 30, 75 L. Ed. 2d 632, 103 S. Ct. 1625 (1983); *White v. WPPSS,* 692 F.2d 1286 (9th Cir. 1982); *Miles v. F.E.R.M. Enters., Inc.,* 29 Wn. App. 61, 70-71, 627 P.2d 564 (1981), and attorney fees. *Duranceau v. Tacoma,* 37 Wn. App. 846, 849-50, 684 P.2d 1311 (1984); *Venegas v. Wagner,* 831 F.2d 1514, 1519 (9th Cir. 1987).

The trial court held that the burden of proving the § 1983 claim was more onerous and, while the evidence established a prima facie case under the tort theory, it failed to do so under § 1983. Specifically, the trial court found that the "malice" element of malicious prosecution could be established by evidence of "reckless disregard" for Peterson's rights, but § 1983 required evidence that Littlejohn *knowingly* submitted false information to the prosecution *with the intent to harm* Peterson.

1 C. Antieau, *Federal Civil Rights Acts* § 143 (2d ed. 1980) reads:

A person has the right to be free from malicious prosecution by individuals acting under "color of law," and defendants

violating this right are liable in actions under § 1983. A typical court states: "The facts underlying state tort claims for false arrest, abuse of process and malicious prosecution may also provide the basis for a section 1983 claim."

A § 1983 action is available against persons acting under color of law for malicious abuse of process, and the presence or absence of probable cause is irrelevant.

Improper motive is an essential element of the tort of malicious prosecution, and courts will require a showing of such improper motive in a § 1983 action based upon the deprivation of the constitutional right to be free from such conduct.

(Footnotes omitted.)

In Washington, the "malice" element of the tort can be supplied *either* by 1) reckless disregard for the rights of the plaintiff; *or* 2) improper or wrongful motive. *Bender v. Seattle, supra.* The question is whether such reckless disregard is sufficient to establish the constitutional cause of action as well, or whether the latter cause of action also requires proof of malicious knowledge or intent. There are no controlling Washington cases.

█ The federal law, including that from the Ninth Circuit, is settled that gross negligence or recklessness will suffice to establish a prima facie case under § 1983. In *Wood v. Ostrander,* 851 F.2d 1212 (9th Cir. 1988) a police officer stopped a car on a traffic offense, arrested and removed the driver, impounded the car and left the female passenger alone at night in a high crime area. She was assaulted as a result and sued the officer under 42 U.S.C. § 1983. The appellate court held:

In *Daniels v. Williams,* 474 U.S. 327, 330–32, 106 S.Ct. 662, 664–65, 88 L.Ed.2d 662 (1986), and *Davidson v. Cannon,* 474 U.S. 344, 347, 106 S.Ct. 668, 670, 88 L.Ed.2d 677 (1986), the Supreme Court held that mere negligence or lack of due care by state officials does not trigger the protections of the Fourteenth Amendment and therefore does not state a claim under § 1983. In doing so, the Court overruled that part of *Parratt [v. Taylor,* 451 U.S. 527, 536–37, 68 L. Ed. 2d 420, 101 S. Ct. 1908 (1981)], which held that a negligent loss of property by state officials could be a "deprivation" under the Due Process Clause. *Daniels,* 474 U.S. at 330, 106 S.Ct. at 664. However, the Court expressly left open the question of "whether something less than intentional conduct, such as recklessness or gross

negligence, is enough to trigger the protections of the Due Process Clause." *Id.* at 334 n. 3, 106 S.Ct. at 667 n. 3.

This question has since been addressed by several courts of appeal. In *Ketchum v. Alameda Co.*, 811 F.2d 1243 (9th Cir.1987), this court stated that *Daniels* did not control the resolution of a § 1983 case claiming state liability for third–party crimes, where the plaintiff had alleged gross negligence by the state. 811 F.2d at 1244, 1246 n. 3. *Other circuits have held recklessness or gross negligence sufficient to state a § 1983 claim, whereas none has held that only intentional misconduct will suffice. See, e.g., Taylor v. Ledbetter,* 818 F.2d 791, 793 (11th Cir.1987) (en banc) (claim that state officials "were 'grossly negligent' or 'deliberately indifferent'" is "sufficient to overcome either a *Daniels* or *Davidson* bar"); *Vinson v. Campbell County Fiscal Court,* 820 F.2d 194, 199–200 (6th Cir.1987) (gross negligence cognizable under § 1983); *White v. Rochford,* 592 F.2d 381, 385 (7th Cir.1979) (gross negligence or reckless disregard for the safety of others is cognizable); *see also Davidson v. O'Lone,* 752 F.2d 817, 828 (3rd Cir.1984) (en banc), *aff'd sub nom., Davidson v. Cannon,* 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986) (gross negligence or reckless indifference sufficient) (plurality view).

In this case, Wood has raised genuine issues of fact tending to show that Trooper Ostrander had acted with gross negligence, recklessness, or "deliberate indifference" to Wood's safety. *See Taylor v. Ledbetter,* 818 F.2d at 793, 795–97 (deliberate indifference to victim's well–being is more than negligence and supports § 1983 claim); *Davidson v. O'Lone, supra,* 752 F.2d at 838; *see also Estelle v. Gamble,* 429 U.S. 97, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) (prison officials' deliberate disregard of prisoner's serious illness or injury violates Eighth Amendment and is cognizable under § 1983). The rationale underlying *Daniels'* bar of negligence–based § 1983 claims is that mere lack of due care, such as leaving a pillow on the prison stairs (*Daniels*) or mislaying an inmate's property (*Parratt*) is "quite remote" from the Fourteenth Amendment's purpose of redressing abuses of power by state officials. 474 U.S. at 332, 106 S.Ct. at 665.

(Footnote omitted. Italics ours.) *Wood,* 851 F.2d at 1214. *Accord, Fargo v. San Juan Bautista,* 857 F.2d 638, 640 (9th Cir. 1988). Here, too, the plaintiff's evidence was sufficient to raise genuine issues of fact that Detective Littlejohn had acted with gross negligence, recklessness, or "deliberate indifference" to Peterson's rights. The jury, in fact, so found with regard to the malicious prosecution claim. The same evidence was sufficient to prove a prima facie case

under § 1983 and the claim should not have been dismissed.

In *Smiddy v. Varney,* 665 F.2d 261 (9th Cir. 1981), *cert. denied,* 459 U.S. 829, 74 L. Ed. 2d 66, 103 S. Ct. 65 (1982) Smiddy was arrested and held, unable to meet the substantial bail, for the murder of a woman with whom he was seen shortly before her death. There, as here, the police investigation was of questionable thoroughness (but not *intentionally* wrongful) and resulted in the plaintiff being imprisoned for approximately a month before the charges were dismissed for lack of probable cause. Smiddy sued the police officers involved for violation of his constitutional rights and was found to have produced sufficient evidence of a § 1983 claim.[3] The appellate court held that the trial court properly denied motions for dismissal of the § 1983 claim at the close of the plaintiff's case. Application of these principles to the instant case compels the conclusion that the trial court erred in dismissing the § 1983 claim at the close of Peterson's case *as to Detective Littlejohn individually.*[4] *See also Mark v. Williams,* 45 Wn. App. 182, 190, 724 P.2d 428, *review denied,* 107 Wn.2d 1015 (1986)

---

[3]The defendants appealed and the case was remanded for retrial on the question of whether the prosecutors's independent (and absolutely immune) decision to file the case should have cut off the police officer's liability for damages. The second appeal appears at *Smiddy v. Varney,* 803 F.2d 1469 (9th Cir. 1986) and decided that issue in the affirmative, limiting the plaintiff's damages and fee recovery to the period of time from arrest to the formal filing of charges. This aspect of the case is distinguishable from the instant case where the prosecutor testified that she would not have filed charges but for the detective's false assertion that Peterson did have acne and a scar. Thus, the "recklessness" of the detective was responsible not only for Peterson's precharge confinement, but for the entire period.

[4]The City of Bellevue is not liable under § 1983 in any event since city police did not cause or contribute to the malicious prosecution of Peterson. *See Turngren v. King Cy.,* 104 Wn.2d 293, 311–12, 705 P.2d 258 (1985); *Hontz v. State,* 105 Wn.2d 302, 714 P.2d 1176 (1986); *Baldwin v. Seattle,* 55 Wn. App. 241, 776 P.2d 1377 (1989).

where an investigator for the state pharmacy board was held not liable under § 1983 where he had a "good faith and *reasonable* belief in the validity of the arrest".[5]

■ Accordingly, it is necessary to remand the matter to the trial court for an award of attorney fees incurred below and for trial of the § 1983 claim. This is so because, despite the award of compensatory damages for malicious prosecution, the plaintiff was entitled to a jury determination of his claim for punitive damages as set forth in his complaint. As stated in *Smith v. Wade, supra,* 461 U.S. at 56:

> We hold that a jury may be permitted to assess punitive damages in an action under § 1983 when the defendant's conduct is shown to be motivated by evil motive or intent, or when it involves reckless or callous indifference to the federally protected rights of others. We further hold that this threshold applies even when the underlying standard of liability for compensatory damages is one of recklessness.

The plaintiff has already been "compensated"[6] for the malicious prosecution and no additional "compensatory" damages are awardable since both the tort and § 1983 claims support this award. *See Hammond v. County of Madera,* 859 F.2d 797, 803 n.2 (9th Cir. 1988). However, a trial on the issue of punitive damages is required where, as here, the issue was improperly withheld from the jury. Whether to award punitive damages is a moral judgment left to the jury, turning on whether the defendant's conduct demonstrated punishable evil motive or reckless indifference to the rights of others. *Smith v. Wade,* 461 U.S. at 52.

The trial court is affirmed except as to the cross claim of the respondent Peterson. The matter is remanded for an

---

[5]Whether or not Littlejohn, in fact, reasonably believed in good faith that Peterson was guilty is an affirmative defense properly considered by a jury. *Smiddy v. Varney, supra; Payne v. County of Humboldt,* 655 F. Supp. 1341 (N.D. Cal. 1987).

[6]Appellants have not questioned the amount of compensatory damages awarded. Thus this award of the jury remains intact.

award of attorney fees and costs incurred at trial pursuant to 42 U.S.C. § 1983 and for a new trial on the sole issue of whether punitive damages should be awarded to Peterson under § 1983.

SWANSON and FORREST, JJ., concur.