[No. 36161-9-I.  Division One.  August 26, 1996.]

DIEDRE LESLEY, ET AL., *as Guardians, Appellants*, v. THE DEPARTMENT OF SOCIAL AND HEALTH SERVICES, ET AL., *Respondents*.

264

*Jo-Hanna Read* and *Law Offices of Jo-Hanna Read*, for appellants.

*Christine O. Gregoire, Attorney General*, and *Rene D. Tomisser* and *Elizabeth J. Erwin, Assistants*; and *Teri M. Dettmer, Nancy A. Balin*, and *Lee, Smart, Cook, Martin & Patterson, P.S., Inc.*, for respondents.

COLEMAN, J. — DSHS caseworker Sally Maurer, suspecting that Diedre and Terell Lesley abused their daughter, removed the child from the parents. Her suspicions proved incorrect, and the Lesleys now contend that Maurer negligently investigated the case and violated their civil rights. Because Maurer may not have followed procedures or acted reasonably, we reverse the summary judgment order for Maurer and the State. The Lesleys also argue that the court erred in holding that Dr. Douglas Lambrecht enjoyed qualified immunity because he was reporting child abuse in good faith. We agree with the trial court and affirm the summary judgment order for the doctor.

The appellate court engages in the same inquiry as the trial court in reviewing an order for summary judgment. *Johnson v. DSHS*, 80 Wn. App 212, 226, 907 P.2d 1223 (1996). Thus, we construe the following facts adduced from the record most favorably to the nonmoving party. *See Johnson*, 80 Wn. App. at 226.

On April 7, 1992, Candyland Day-care workers noticed

marks on the lower back and buttocks of Taylor Lesley, the Lesley's 11-month-old African American daughter, when cleaning her backside after severe diarrhea. The workers did not recall seeing the marks previously but noted that they may not be able to see them during normal diaper changes. Day-care manager Shellie Weitz had heard of but never seen Mongolian spots, a birthmark appearing in the vast majority of African American children. Believing that they would be able to determine whether the marks were bruises or birthmarks, she decided to call Child Protective Services.

At around 4 or 4:30 p.m., CPS worker Maurer looked at the marks. The day-care workers told Maurer that they had not seen these marks previously and that the child also had a rash in the vaginal area. Maurer called her supervisor, Sally Scott, who told Maurer to have the police examine the child. Maurer called the police and the child's regular pediatrician, Dr. Arredondo, to determine if the child had any birthmarks and to arrange for an examination. The doctor's office told Maurer that Dr. Arredondo was unavailable and advised her to take Taylor to the emergency room at Valley General Hospital. The police then arrived and examined Taylor. Maurer noted that when the officer pressed on the marks, the child cried "in pain." The officer decided that the child should be taken into protective custody. Maurer told Weitz that she did not have time to talk to the parents. When Weitz asked Maurer what she should tell the parents, Maurer said to tell them that bruises were found on the child's buttocks. The Lesleys arrived at the day care at 5:30 p.m. and were very upset to find their daughter absent.

Maurer took Taylor to Valley General Medical Center's Emergency Room, where two police officers soon arrived. The officers had been dispatched because of the mother's apparently hostile reaction to the news that her daughter had been taken into protective custody. The officers informed Maurer that the parents said the child had normal markings on her backside. Maurer did not then

relay this information to Valley General's Dr. Lambrecht, nor did she inform the doctor about Taylor's vaginal rash.

Dr. Lambrecht examined the child, including the vaginal area. He asked Maurer whether Taylor had a history of Mongolian spots. Maurer repeated only what the day-care workers had told her. Dr. Lambrecht called Dr. Arredondo, who was not in her office. Dr. Burkebile, who was on call for Dr. Arredondo, checked Taylor's chart and found no reference to Mongolian spots. Dr. Lambrecht concluded that Taylor did not appear to be sexually assaulted and diagnosed the marks as "contusions to the buttocks and lower back, possible physical child abuse." Dr. Lambrecht advised Maurer to have Dr. Arredondo or an expert at Children's Hospital or Harborview see Taylor. Maurer did not follow these instructions.

At 7:30 p.m. that day, Maurer brought Taylor to the home of Joanne Maloy, a foster care provider. Maurer told Maloy about the marks and the diaper rash. Maurer called Maloy at least once each day except Sunday and asked her if the marks had changed. Maloy repeatedly told Maurer that the marks had not changed. Maloy stated that Maurer never told her the parents wanted visitation with Taylor over the weekend, which Maloy would have gladly accommodated. Maurer also told Maloy after an interview with the parents that Taylor's mother was "out of control" and "was the one who probably abused the baby[.]"

On or about April 7, Dr. John Neff of Children's Hospital received a call regarding Taylor from a caseworker who stated that she had seen bruises over the child's buttocks. The caseworker asked if the child needed to be seen at Children's Hospital for further confirmation. Dr. Neff asked if photographs had been taken, and the caseworker told him that they had been. Because the caseworker gave him the impression that there were no questions about the diagnosis, Dr. Neff told her that it was not necessary for the child to be seen at Children's Hospital.

On Wednesday, April 8, Maurer and another caseworker

interviewed the Lesleys separately and with their attorney, Edna Verzani. Verzani testified that the interviewers were not listening carefully and that she had to correct them several times. Each parent described Taylor's birthmark as a greenish color covering an area of Taylor's lower back and upper buttocks. Diedre Lesley told Maurer that she had similar marks on herself and offered to show her. Maurer declined to look. Maurer asked the parents whether there were any marks on Taylor's lower back. The parents said that there were not. Maurer did not believe that the parents' description adequately described Taylor's marks.

On Thursday, April 9, Maurer supervised a visit between the parents and Taylor. Maurer claimed that neither parent mentioned noticing a yeast infection at this time, but the parents did state that Taylor needed A & D Ointment because baby powder gave her a diaper rash. The Lesleys observed Taylor's marks and told Maurer that the marks were exactly as they had described. Maurer told them that their description was different.

Also on Thursday, April 9, Maurer contacted Taylor's paternal grandmother, Ruth Lesley Dunlap, who told her that the baby had no marks or skin discolorations. Dunlap had cared for the baby once for three days.

At a shelter care hearing on Friday, April 10, both parents and Taylor's maternal grandmother, Emma Jane Newell, testified that Taylor had one main birthmark on her backside. Maurer testified that the marks that the parents described were substantially different from the ones she observed. Commissioner Maurice Epstein determined that the child should stay with the foster parent but recommended to return the child as soon as possible if there was strong "or even reasonable evidence that nothing did occur on the part of the parents and that there is no real injury at that time." The commissioner ordered liberal visitation.

After the hearing, Newell made a dermatologist appointment for Taylor for that afternoon. Verzani claimed that

Newell called Commissioner Epstein and explained that the parents needed help facilitating the transportation. The commissioner authorized Newell to take Taylor to the doctor and told Verzani that he had conveyed this information to Scott. When Verzani contacted Scott, she denied that the commissioner had authorized Newell to take the child. Newell went to CPS and awaited information as to where to pick up Taylor. Finally, it became too late to keep the appointment. Scott then indicated that she had not been able to reach the foster care provider. Maloy, who had taken her son to the hospital on Friday afternoon, apologized to Maurer for not being available. Maloy stated that Maurer told her that CPS really did not want to keep the appointment in any case.

Dr. Neff claimed that on or about April 10, the caseworker again called him and asked what she could do to substantiate bruising. At this time, the caseworker told him that the family said the child had a birthmark. Dr. Neff explained that it was easy to differentiate the two because a bruise would change color or show other signs of resolution.

On Saturday morning, April 11, Maurer told Dr. Lambrecht that the parents claimed the marks were from birth but that they gave a different description in court. She then called Dr. Arredondo, who stated that, based on an emergency room transcription she had received, she could not state whether the marks had changed but that she would examine Taylor. Maurer then called Dr. Neff, who was not on duty, and instead spoke to Dr. Lehman. Dr. Lehman told Maurer to have Dr. Lambrecht recheck the mark to see whether it had changed. Dr. Lehman told her that if Dr. Lambrecht was not convinced, Maurer should bring the child to Children's emergency room, where the doctors would then determine what the marks were.

At about 5:30 p.m. on Saturday, Maurer picked up Taylor to take her to Dr. Lambrecht. Maurer claims that she had been unable to get in touch with Maloy to pick up Taylor earlier, but Maloy claims that she waited all

afternoon for Maurer's arrival. Dr. Lambrecht thought that the marks, "if anything," were slightly more grayish. The mark's grayness, the doctor stated, "might weigh slightly more that it was more likely a [M]ongolian spot than a contusion, but it wouldn't necessarily rule it out." Maurer did not tell Dr. Lambrecht that the foster mother had not noticed any changes in the marks. Since it was after 7 p.m., Maurer decided to take the child back to the foster home.

On Monday, April 13, Dr. Kenneth Feldman at Odessa Brown Children's Clinic diagnosed the marks as Mongolian spots and not bruises. He further diagnosed a yeast rash in the genital area and prescribed appropriate treatment. The child was then returned to the Lesleys.

The Lesleys offered the Declaration of Jon Conte, a professor of social work, who found that Maurer investigated in an unreasonable fashion based on biased and partial information. Conte determined that Maurer should have followed Dr. Lambrecht's advice in consulting an expert and that she should have personally notified the parents that the child was being taken into protective custody. Conte found that Maurer made inappropriate remarks to the foster mother, indicating her lack of willingness to work in a positive manner, and that she inappropriately did not convey complete information to Dr. Lambrecht concerning the marks.

Dr. Abraham B. Bergman, a pediatrician at Harborview Medical Center and the Director of the Child Abuse Consultation Network in Washington, stated that CPS's behavior was outrageous. Additionally, Dr. Feldman stated that Dr. Lambrecht did not make a competent diagnosis following the recognized standards of care required of physicians who examine children for abuse.

The complaint named the caseworkers in their official capacity:

> Defendants The Department of Social and Health Services, Sally Scott and Sally Maurer under the color of law and pretext under the statutes, regulations and practices of the

State of Washington and *under the authority of their offices for the Department of Social & Health Services* deprived plaintiffs of their constitutional right to a familial relationship, to care and proper treatment, and to due process of law.

(Emphasis added.)

The court granted summary judgment for defendants, finding that because Scott and Maurer's actions were consistent with the statutory framework, they enjoyed qualified immunity for all claims. The court further determined that the State was immune based on the caseworkers' immunity. Additionally, the court granted summary judgment for Dr. Lambrecht based on qualified immunity.

## NEGLIGENT INVESTIGATION

We first address the Lesleys' claim that the caseworkers and the State are liable for their negligent investigation into allegations of possible child abuse.[1] The State argues that Washington law does not recognize negligent investigation as an independent cause of action. We thus first address whether Washington recognizes this tort.

In *Babcock v. State*, 116 Wn.2d 596, 606, 618, 809 P.2d 143 (1991), the Supreme Court held that DSHS caseworkers were entitled to qualified, not absolute, immunity for negligent foster care investigation and placement. The alleged negligent investigation occurred when caseworkers placed several young girls with a relative who raped them. *Babcock*, 116 Wn.2d at 598. Defendants attempt to distinguish *Babcock*, arguing that *Babcock* involved negligent placement, while this case involves negligent investigation of possible abuse. The *Babcock* court, however, noted that the gravamen of the complaint was negligent investigation. *Babcock*, 116 Wn.2d at 610-12. Furthermore, in *Dunning v. Paccerelli*, 63 Wn. App.

---

[1]While Sally Scott is named individually on appeal, plaintiffs did not provide briefing regarding her liability. Appellants have thus waived the issue of Scott's liability on appeal. RAP 10.3(a)(5).

232, 238-40, 818 P.2d 34 (1991), *review denied*, 118 Wn.2d 1024 (1992), the court, rejecting the argument that investigating possible child abuse was distinct from *Babcock*'s foster care placement, explicitly recognized a negligent investigation claim against a DSHS worker. *See also Waller v. State*, 64 Wn. App. 318, 334, 824 P.2d 1225 (recognizing possible liability for negligent investigation of DSHS caseworkers), *review denied*, 119 Wn.2d 1014 (1992).

Washington courts have not recognized a cause of action for negligent investigation in some other contexts. *See Lambert v. Morehouse*, 68 Wn. App. 500, 504, 843 P.2d 1116 (employer does not owe a duty to conduct a reasonable investigation before discharge because employer can dismiss at will employee for no cause), *review denied*, 121 Wn.2d 1022 (1993); *Dever v. Fowler*, 63 Wn. App. 35, 45, 816 P.2d 1237 (1991) (noting chilling effect of recognizing a cause of action for negligent investigation by police in arson case), *review denied*, 118 Wn.2d 1028 (1992); *Donaldson v. City of Seattle*, 65 Wn. App. 661, 671, 831 P.2d 1098 (1992) (no recognized tort of negligent investigation when police officers have no statutory duty to conduct follow-up investigations). The *Dever* court reasoned that recognizing such a cause of action "would impair vigorous prosecution and have a chilling effect upon law enforcement." *Dever*, 63 Wn. App. at 45. But here, a specific statute provides that DSHS caseworkers have a duty to investigate. RCW 26.44.050. A cause of action for negligent investigation thus exists against DSHS caseworkers. *See* RCW 26.44.050; *Babcock*, 116 Wn.2d at 606, 618; *Dunning*, 63 Wn. App. at 238-40.

## CASEWORKER AND STATE QUALIFIED IMMUNITY

We next address whether Maurer is entitled to qualified immunity as a matter of law. State employees enjoy qualified statutory immunity for reporting child abuse:

(1)(a) Except as provided in (b) of this subsection, any person participating in good faith in the making of a report pursuant to this chapter or testifying as to alleged child abuse

or neglect in a judicial proceeding shall in so doing be immune from any liability arising out of such reporting or testifying under any law of this state or its political subdivisions.

RCW 26.44.060(1)(a). The burden is on the caseworker to prove that he or she acted in good faith under RCW 26.44.060 in reporting the abuse. *Dunning*, 63 Wn. App. at 240. State employees also enjoy qualified common law immunity for investigating child abuse. *Babcock*, 116 Wn.2d at 618. To receive this qualified immunity, the caseworker must (1) carry out a statutory duty, (2) according to procedures dictated by statute or superiors, and (3) act reasonably. *Babcock*, 116 Wn.2d at 618. No issue of fact exists concerning Maurer's initial response to the suspected abuse under RCW 26.44.040(1)(a). The sole issue is thus whether Maurer is entitled to qualified immunity for her investigation.

The Lesleys claim that Maurer fails to meet *Babcock*'s qualified immunity requirements because she did not follow established procedures. The statute emphasizes the importance of family unity. *See* RCW 26.44.010 ("The bond between a child and his or her parent, custodian, or guardian is of paramount importance, and any intervention into the life of a child is also an intervention into the life of the parent, custodian, or guardian . . ."); WAC 388-15--130 (one goal of CPS is to "[m]aintain, support, or reunify families to the extent possible consistent with the safety of the child."). The Department of Child and Family Services manual also emphasizes the need for culturally sensitive interviewing techniques and responses that remedy the situation in the shortest reasonable time and prevent or reduce the need for out of home placement. Section 26.11(A)(3)(a); 26.11(B)(2)(a) and (e); 26.12; 26.31. Other provisions emphasize expediency. For instance, section 26.53 provides that DCFS staff have a statutory duty to notify the child's parents at the earliest point of time that will not jeopardize the safety and protection of the child and the course of the investigation. And section 26.42(K)

states in part that "[t]he DCFS social worker shall return a child to home at the earliest opportunity consistent with the safety needs of the child."

Here, the Lesley's presented evidence that Maurer removed the child from the day-care without calling the parents. *Cf.* section 26.53. Maurer also failed to tell Dr. Lambrecht and the court immediately that the parents said that the marks were Mongolian spots or that the foster mother said that the marks had not changed. *Cf.* section 26.11, 26.12, 26.31. Additionally, Maurer failed to follow Dr. Lambrecht's advice to take the child to an expert after the doctor expressed reservation about his ability to diagnose the possible child abuse. Such actions may have violated the mandate of speedy family reunification consistent with the child's safety needs. *Cf.* WAC 388-15-130. Finally, her conversations with Maloy and the Lesleys indicate that Maurer may have lacked cultural sensitivity. Because the Lesleys presented evidence raising questions of fact concerning whether Maurer followed procedures, we reverse the finding of qualified immunity for Maurer and remand for trial.

Maurer may have also failed to comply with *Babcock*'s reasonableness requirement. No discovered case has squarely addressed the definition of reasonableness under *Babcock*. Because reporting decisions must be conducted with reasonable good faith, the investigation following such reporting is also subject to the same standard. The caseworker must act with a reasonable good faith intent, judged in light of all the circumstances then present in conducting an investigation into child abuse. *See Dunning v. Paccerelli*, 63 Wn. App. 232, 240, 818 P.2d 34 (1991), *review denied*, 118 Wn.2d 1024 (1992). We note parenthetically that this standard differs from the traditional negligence standard. To adopt such a standard would effectively nullify *Babcock*'s grant of qualified immunity. *Babcock v. State*, 116 Wn.2d 596, 618, 809 P.2d 143 (1991).

Here, whether Maurer acted with reasonable good faith presents issues of fact. *See Dunning*, 63 Wn. App. at 240.

For instance, her delay in resolving the matter, her failure to inform the doctors and the court fully concerning the parents' and foster mother's statements, and her statements to Maloy provide issues of fact concerning her reasonable good faith. We thus find that there are issues of fact concerning reasonableness sufficient to withstand summary judgment.

■ The State claims that the Lesleys are collaterally estopped from relitigating the dependency proceeding. For collateral estoppel to bar a claim, four requirements must be met: (1) The issue decided in the prior adjudication must be identical with the one presented in this action; (2) there must have been a final judgment on the merits; (3) the party against whom the plea is asserted must have been a party or in privity with a party in the prior adjudication; and (4) the application must not work an injustice on the party against whom the doctrine is being applied. *Rains v. State*, 100 Wn.2d 660, 665, 674 P.2d 165 (1983).

■ Here, the requirements are not met. The issue involves the investigation by DSHS, not the outcome of the shelter care hearing. A shelter care hearing is also not a final adjudication on the merits. *See In re Welfare of Key*, 119 Wn.2d 600, 609, 836 P.2d 200 (1992) (dependency hearing is "a preliminary, remedial, nonadversary proceeding"), *cert. denied*, 507 U.S. 927 (1993). The Lesleys are not appealing the outcome of the shelter care hearing, but the investigation conducted that led to their daughter's six-day removal. We reject this claim.

■ The defendants also claim that the social workers are shielded by absolute prosecutorial immunity because a dependency proceeding had commenced. In *Babcock v. State*, 116 Wn.2d 596, 809 P.2d 143 (1991), the court noted in dicta that the caseworkers may have been entitled to absolute immunity had they initiated a dependency hearing where they entered investigation results into evidence and were made part of an adversary process. *Babcock*, 116 Wn.2d at 612. But the Lesleys note that *Babcock* also

stated, "It is good policy to grant caseworkers a qualified immunity for initiation of dependency proceedings without granting absolute immunity for everything they do while a dependency review process continues." *Babcock*, 116 Wn.2d at 616. We hold that absolute prosecutorial immunity is not available here. *Babcock* is ambiguous, and the language favoring absolute immunity is dicta. Moreover, the dependency case did not proceed to full adjudication but was dismissed after a preliminary hearing.

■ Because we find no qualified immunity for Maurer, the State does not share any qualified immunity. We note that, in any case, the State does not enjoy the qualified immunity of its employees in this context. *See Savage v. State*, 127 Wn.2d 434, 438, 447, 899 P.2d 1270 (1995) (State did not share its parole officers' qualified immunity even when liability was based solely on respondeat superior); *Babcock*, 116 Wn.2d at 620 (declining to extend the qualified immunity afforded to DSHS caseworkers to the state agency). We thus reverse the summary judgment order for the State.

## 42 U.S.C. § 1983

The next issue we consider is whether Maurer's actions deprived the Lesleys of fundamental federal constitutional rights, thus forming a basis for a section 1983 claim. Defendants claim that the Eleventh Amendment bars section 1983 actions against the State, its agencies, and its employees because the plaintiffs failed to name the caseworkers in their individual capacities. Defendants alternatively argue that the Lesleys have not established a prima facie case that the caseworkers acted with deliberate indifference as required under section 1983.

We first address whether the complaint sufficiently identified Maurer in her individual capacity. Here, plaintiffs did not specifically state that they were suing the caseworkers individually but stated that they were suing the caseworkers "under the authority of their offices for the [DSHS.]"

■■■■■ Courts look at the totality of the complaint as well as the course of the proceeding to determine whether defendants were provided with sufficient notice of potential personal liability. *Yorktown Medical Lab., Inc. v. Perales*, 948 F.2d 84, 88-89 (2nd Cir. 1991). The *Yorktown* court found that because the complaint sought punitive damages, which are only available in individual capacity suits, notice was provided that defendants were being sued in their individual capacity. *Yorktown*, 948 F.2d at 89; *accord Hill v. Shelander*, 924 F.2d 1370 (7th Cir. 1991) ("where the complaint alleges the tortious conduct of an individual acting under color of state law, an individual capacity suit plainly lies, even if the plaintiff failed to spell out the defendant's capacity in the complaint."); *Brunken v. Lance*, 807 F.2d 1325, 1329 (7th Cir. 1986) (court found personal liability even though complaint named defendants "not as individuals but under the color and pretense of the statutes, regulations, customs and usages of the State of Illinois, and under their authority as employees of the State of Illinois.").

Here, the complaint requests punitive damages and attorney fees and thus indicates that the plaintiffs intended to sue the caseworkers in their individual capacity. Furthermore, Maurer argued at trial and on appeal that she is entitled to qualified immunity, indicating that she had notice that she was being sued individually. Finally, the lower court's ruling on summary judgment was based on qualified immunity, not the Eleventh Amendment. We thus construe the pleadings to permit individual suit against Maurer.

■■■■ To support a claim under section 1983, the Lesleys must establish that a person acting under color of state law deprived them of a federal constitutional or statutory right. *Robinson v. City of Seattle*, 119 Wn.2d 34, 58, 830 P.2d 318, *cert. denied*, 506 U.S. 1028 (1992). The plaintiff must also present evidence establishing gross negligence, recklessness, or deliberate indifference. *Peterson v. Littlejohn*, 56 Wn. App. 1, 14-15, 781 P.2d 1329 (1989), *citing*

*Wood v. Ostrander*, 851 F.2d 1212, 1214 (9th Cir. 1988). In *Peterson*, the court noted that when plaintiff presented evidence of more than mere negligence, a police investigation of questionable thoroughness could give rise to a section 1983 claim even if the investigation was not intentionally wrongful. *Peterson*, 56 Wn. App. at 16.

▇▇▇ To receive qualified immunity under section 1983, a state official performing discretionary functions must show that the official's conduct "[did] not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Gurno v. Town of LaConner*, 65 Wn. App. 218, 227, 828 P.2d 49, *review denied*, 119 Wn.2d 1019 (1992), *citing Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). The right's contours must be sufficiently clear such that a reasonable official would understand he or she is violating that right. *Robinson*, 119 Wn.2d at 66 (*quoting Anderson v. Creighton*, 483 U. S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987)).

▇▇▇ Here, questions of fact exist concerning whether Maurer's actions deprived the Lesleys of their fundamental right to their child's companionship. *In re Myricks*, 85 Wn.2d 252, 253-54, 533 P.2d 841 (1975). Testimony from Dr. Conte indicates that Maurer's actions were "outrageous," not merely negligent. Whether the evidence establishes more than mere negligence is a jury question. Additionally, the State failed to sustain its burden in showing that a reasonable caseworker would not have known the contours of the well-established family unity right. We thus reverse the court's finding that Maurer is protected by qualified immunity for the section 1983 claim.

The Lesleys have requested attorney fees on appeal which they are entitled to if they ultimately prevail on the merits. In the event they prevail, they may request attorney fees for this appeal in the trial court.

## DOCTOR QUALIFIED IMMUNITY

We finally consider whether the trial court erred in find-

ing Dr. Lambrecht immune for his actions under RCW 26.44.060(1). RCW 26.44.060(1) provides immunity to any person participating in good faith in reporting or testifying as to alleged child abuse or neglect in a judicial proceeding. In determining the definition of a report, we look to RCW 26.44.030. This statute states that when any practitioner has reasonable cause to believe that a child has suffered abuse or neglect, the practitioner shall "report" such incident to the proper law enforcement agencies. RCW 26.44.030(1). It also states that any other person who has reasonable cause to believe a child has suffered abuse or neglect may also "report" such incident. RCW 26.44.030(3). The critical inquiry is whether Dr. Lambrecht was making a report under either RCW 26.44.030(1) or (3), thus entitling him to qualified immunity.

The Lesleys argue that a "report" refers to an initial report of child abuse before the child has been taken into DSHS custody, and thus, Dr. Lambrecht was not "making a report" as defined by the statute. Dr. Lambrecht claims that the Lesleys' narrow reading defies statutory construction rules. Dr. Lambrecht also argues that if the Legislature intended to confer immunity only to the first person making the report, it would not have extended immunity to persons testifying.

The scant case law is conflicting. In *City of Seattle v. Shin*, 50 Wn. App. 218, 226, 748 P.2d 643, *review denied*, 110 Wn.2d 1025 (1988), the court stated that RCW 26.44.060(1) imposed a statutory duty upon certain individuals to contact law enforcement officials when they had reasonable cause to suspect abuse. The court noted that these people and any others making such a report were immune from liability. *Shin*, 50 Wn. App. at 226. Because Dr. Lambrecht was not reporting to law enforcement officials, the Lesleys claim that he is not entitled to immunity. But in *Spurrell v. Block*, 40 Wn. App. 854, 866, 701 P.2d 529, *review denied*, 104 Wn.2d 1014 (1985), the court afforded immunity to a police officer who made a child abuse report even though a nurse had already made

an initial child abuse report and the officer was responding to her call. Contrary to *Shin, Spurrell* indicates that even those not initially reporting the abuse or contacting law enforcement are entitled to the statute's protections.

■■■ While case law is scant, we hold that Dr. Lambrecht is subject to the protections of RCW 26.44.060. First, the statute refers to any person making a report, not just the initial reporting person. RCW 26.44.030(1) and (3). Second, RCW 26.44.060 affords immunity for all those testifying concerning abuse. It would thus be nonsensical to provide immunity to the doctor when he testified, but not when he only made a report. Finally, *Spurrell* indicates that all persons are immune in making reports of child abuse, regardless of whether they were the initial reporter or had increased decision-making responsibility. *See Spurrell*, 40 Wn. App. at 866-67.

■■■ We finally address whether Dr. Lambrecht's actions met RCW 26.44.060's "good faith" requirement. To establish good faith, Dr. Lambrecht must have acted with a "reasonable good faith intent, judged in light of all the circumstances then present[.]" *Dunning v. Paccerelli*, 63 Wn. App. 232, 240, 818 P.2d 34 (1991), *review denied*, 118 Wn.2d 1024 (1992). No evidence indicates that Dr. Lambrecht did not act in reasonable good faith. We thus affirm the summary judgment order for Dr. Lambrecht.

The order of the trial court is affirmed in part and reversed in part.

GROSSE and WEBSTER, JJ., concur.

After modification, further reconsideration denied October 16, 1996.

Review denied at 131 Wn.2d 1026 (1997).