IN THE COURT OF APPEALS FOR THE STATE OF WASHINGTON

| | | |
|---|---|---|
| RONALD RAE, | ) | No. 84143-2-I |
| | ) | |
| Appellant, | ) | DIVISION ONE |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| STATE OF WASHINGTON, | ) | |
| DEPARTMENT OF SOCIAL AND | ) | |
| HEALTH SERVICES and DEFENDANT | ) | |
| DOES (1-10) | ) | |
| | ) | |
| Respondents. | ) | |
| | ) | |

ANDRUS, C.J. — Ronald Rae appeals the summary judgment dismissal of the lawsuit against the State of Washington's Department of Children, Youth, and Families[1] after the Department filed a dependency petition that resulted in his children being removed from his care. He contends the trial court erred in concluding that he was collaterally estopped from bringing his negligent investigation claim. Because the doctrine of collateral estoppel bars this lawsuit, we affirm.

---

[1] Rae filed suit against the Department of Social and Health Services (DSHS) and Child Protective Services (CPS). However, in 2018, CPS was transferred to the newly-created Department of Children, Youth, and Families (DCYF). RCW 43.216.906.

Citations and pin cites are based on the Westlaw online version of the cited material.

FACTS

Rae and his former domestic partner, Aaron Taylor, have triplet sons, In, Ic, and Ih.[2] Rae is the biological father of the boys, born through surrogacy in August 2016. In the early months of their lives, the children lived with Rae and Taylor in Stevens County with Rae traveling three days a week to Bellevue for work. While Rae was working, Taylor and his parents cared for the infants.

When the infants were six weeks old, Ih was diagnosed with a femur fracture, while Rae and Taylor were visiting Rae's parents in Montana. St. Peter's Hospital in Helena, Montana, where Ih received treatment, reported what appeared to be non-accidental trauma to social services authorities. The Montana agency found the claim was unsubstantiated, meaning it was neither founded nor unfounded. The parents left Montana with the children thereafter.

On December 1, 2016, Rae and Taylor took another boy, Ic, then three months old, to the hospital where doctors determined that he had multiple bone fractures and subdural hematomas, potentially resulting from physical abuse. An examination of In and Ih revealed that both boys had sustained similar rib fractures.

On December 7, 2016 the Department filed a dependency petition in Stevens County, alleging that the children had been abused under RCW 13.34.030(6)(b) and that the children lacked any parent capable of adequately caring for them under RCW 13.34.030(6)(c). That same day, the juvenile court authorized the Department to take the children into custody and place them in

---

[2] Because the children all have identical initials, we refer to them as the parties do in their briefing.

shelter care. At a shelter care hearing, Rae, who was represented by counsel, agreed to the entry of an order in which the court found that each child was in need of shelter care because "there is reasonable cause to believe. . . [t]he child has no parent, guardian, or legal custodian to provide supervision or care for such child; and/or [t]he release of the child would present a serious threat of substantial harm to the child."

Following this hearing, the court temporarily placed the children with Rae's aunt and uncle, James and Mary Rae. Rae had supervised visitation with his sons twice per week for two hours.

On December 21, 2016, the Department amended the dependency petition to add information it had acquired in its investigation. The amended petition included medical reports from Dr. Kenneth Feldman and Advanced Registered Nurse Practitioner Teresa Forshag, both of whom recommended that the Department undertake further investigation into the injuries. Forshag noted that "[n]o history has been presented that would explain the fractures. Given the information available at the time of this consult, I am concerned that [each child] has been physically abused. This opinion is strengthened by the fact that his triplet siblings also have what appear to be inflicted injuries." The petition asserted that Rae and Taylor blamed each other for the injuries and gave conflicting and varying explanations for them.

On January 3, 2017, the Department again amended the dependency petition. This second amended petition provided more detail regarding the incident in which Ih had broken his femur. In a new report, Forshag stated that Rae told her he was caring for the infant at the time Ih was injured. Rae claimed

- 3 -

that Ih slid off his chest while Rae was lying on the bed and when he reached out to grab Ih, he "may have pinched [Ih]'s body against his chest." He did not remember grabbing the infant by his leg. Forshag opined that "[t]he history provided by the father would be an unusual mechanism for this type of fracture." She further reported that Ih had rib fractures consistent with a "squeezing type injury." After Forshag submitted her report, the Department also alleged it had received medical records from the Montana hospital revealing that Rae's version of events leading to Ih's injury was inconsistent with the version he reported to Forshag.

The second amended petition further noted the children did not suffer from any identifiable medical condition which might increase their susceptibility to broken bones and the consulting physicians continued to suspect child abuse. The Department also highlighted the parents' failure to cooperate with the hospital and numerous instances of Rae's lack of candor.

On January 30, 2017, Rae stipulated—with the advice of counsel—to an agreed order of dependency. Rae did not dispute the Department's allegations in its amended dependency petition and the juvenile court adopted those allegations as findings of fact. The court also found

> C. The below signed parties agree to the establishment of dependency pursuant to RCW 13.34.030(6)(c) (no parent or guardian).
>
> D. It is contrary to the child's welfare to return home. The child should be placed or remain in the custody, control, and care of DSHS/DCFS because:
>
>> A manifest danger exists that the child will suffer serious abuse or neglect if the child is not removed from the home

- 4 -

> and an order under RCW 26.44.063 would not protect the child from danger.
>
> . . . .
>
> G. DSHS/DCFS has made an effort to place the child with a relative known to the child and with whom the child has a relationship and a relative is not available or willing to care for the child and to meet any special needs of the child.
>
> H. DCFS shall proceed immediately with [the Interstate Compact on Placement of Children[3] (ICPC)] re: the parents of Ron Rae in Montana when dependency is established as to both parents. This allows the placement process to start. . . . Pending clearance by law enforcement and approval via the ICPC process, DCFS sees these relatives as a potentially viable placement option.

Rae agreed to the entry of a dispositional order requiring him to participate in and complete certain services, including a chemical dependency assessment, a psychological evaluation, a mental health assessment, a parenting assessment, hands-on parenting training, and an anger management or domestic violence assessment. In addition, the court ordered Rae to refrain from threatening Taylor and to demonstrate his ability to meet the children's physical, emotional, and psychological needs by progressing in services and following all recommendations of his service providers.

Because Rae stipulated that there was no relative available or capable of then caring for the infants, the juvenile court ordered temporary placement in foster care until Rae's parents could complete the ICPC process. On March 29, 2017, the court modified its placement order when Rae's parents successfully obtained ICPC approval. The Department promptly relocated the children to Montana to live with Rae's parents.

---

[3] Ch. 26.34 RCW.

Over the next eight months, the juvenile court held several dependency review hearings. Each time, the court concluded that out-of-home placement was still needed. In a June 2017 agreed order, the court found that Rae was not compliant with court-ordered services. The Department reported the results of Rae's January 2017 psychological evaluation, including a diagnosis of a personality disorder with histrionic, narcissistic, and paranoid personality features. The psychologist did not recommend the return of the children to Rae. By October 2017, Rae had come into compliance with most of the court-ordered services and was undergoing mental health treatment. But the court found that there had been "no resolution of the problems that necessitated the child[ren's] placement in out-of-home care, with each parent continuing to blame the other for the intentional, inflicted injuries suffered by the children. Neither parent is in a position to provide safe care for the child[ren], nor does any provider so recommend."

In November 2017, the court granted Rae's request to move family therapy services and visitation to the Seattle area and changed the children's permanency plan to a return home with Rae based, in part, on his engagement in domestic violence prevention services. On December 11, 2017, the juvenile court ordered a trial return home, reuniting Rae with his children. It found that "the child[ren] no longer face[ ] a manifest danger that [they] will suffer serious abuse or neglect if not removed from the home. The parent is able to care safely for the child[ren] under an in-home dependency," as long as Rae continued to engage in therapy and domestic violence services.

After the court returned the children to his care, Rae successfully moved for a change of venue to King County, where he then lived, and where his parents

had relocated with the infants. On June 11, 2018, the trial court approved Rae's proposed parenting plan and granted Rae sole custody of the triplets. This order included findings that Taylor had abandoned, neglected, and abused the children and it prohibited Taylor from having any contact with the children. The Department took no position on the proposed parenting plan, and on June 30, 2018, it agreed to the dismissal of the dependency.

In February 2021, Rae filed this lawsuit against the Department, alleging that the Department had conducted a negligent investigation into the abuse. The Department moved to dismiss Rae's complaint under CR 12(c), arguing Rae was collaterally and judicially estopped from bringing this claim. In opposing the motion, Rae submitted a declaration in which he testified that he stipulated to the dependency order only to prevent his children from being placed in separate foster homes.

Because Rae presented matters outside of the pleadings, the trial court converted the Department's CR 12(c) motion to a motion for summary judgment under CR 56. Under that standard, the trial court dismissed the case. Rae now appeals that dismissal.

ANALYSIS

Standard of Review

Under CR 12(c), a party may move for the court to enter judgment on the pleadings. We review a motion for a judgment on the pleadings under CR 12(c) de novo. *Mohandessi v. Urban Venture LLC*, 13 Wn. App. 2d 681, 698, 468 P.3d 622 (2020) *review denied,* 196 Wn.2d 1043, 481 P.3d 545 (2021). But when, as here, the trial court considers materials outside the pleadings, we treat the CR

- 7 -

12(c) motion as a motion for summary judgment under the standards of CR 56. CR 12(c); *Didlake v. Washington State*, 186 Wn. App. 417, 422, 345 P.3d 43 (2015). This court reviews a summary judgment order de novo. *M.W. v. Dep't of Soc. & Health Servs.*, 149 Wn.2d 589, 595, 70 P.3d 954 (2003). A motion for summary judgment will be granted if there are no genuine issues of material fact and the moving party is entitled to a judgment as a matter of law. CR 56(c).

<u>Collateral Estoppel</u>

Rae argues the trial court erred in dismissing his negligent investigation claim under the doctrine of collateral estoppel. We disagree.

Collateral estoppel bars a party from relitigating a previously litigated issue against the same party in a subsequent proceeding. *Christensen v. Grant County Hosp. Dist. No. 1*, 152 Wn.2d 299, 306, 96 P.3d 957 (2004). Collateral estoppel applies when

> (1) the issue decided in the prior adjudication is identical with the one presented in the second action; (2) the prior adjudication must have ended in a final judgment on the merits; (3) the party against whom the plea is asserted was a party or in privity with the party to the prior adjudication; and (4) application of the doctrine does not work an injustice.

*Thompson v. Dep't of Licensing*, 138 Wn.2d 783, 790, 982 P.2d 601 (1999) (quoting *Nielson v. Spanaway Gen. Med. Clinic, Inc.,* 135 Wn.2d 255, 262-63, 956 P.2d 312 (1998)). "Because all four elements must be proved, the proponent's failure to establish any one element is fatal to the proponent's claim." *LeMond v. Dep't of Licensing*, 143 Wn. App. 797, 805, 180 P.3d 829 (2008). The party asserting collateral estoppel bears the burden of proof. *State Farm Mut. Auto. Ins. Co. v. Avery*, 114 Wn. App. 299, 304, 57 P.3d 300 (2002). We review a trial

court's application of collateral estoppel de novo. *Schibel v. Eymann*, 189 Wn.2d 93, 98, 399 P.3d 1129 (2017).

    1.    <u>Identical Issue of Fact</u>

Rae first argues that the issues he raises in his negligent investigation claim, including whether the Department was negligent in removing his children from his home, are distinct from any issue raised in the dependency proceedings. But a key factual issue underlying Rae's negligent investigation claim is identical to a determinative fact litigated in the dependency case—namely, whether Rae's inability to keep the children safe caused the court to remove them from his home.

"[O]nly questions of fact actually litigated and essential to the judgment in the first adjudication become precluded by collateral estoppel.**"** *Beagles v. Seattle-First Nat. Bank*, 25 Wn. App. 925, 930, 610 P.2d 962 (1980). Therefore, the Department must show that a "fact determined in the first action is essential, and not merely collateral or incidental, to the right asserted in the second." *Id.*

In Rae's dependency action, the Department had to prove that the children met the statutory definition of a "dependent" under RCW 13.34.030(6), before the court could order their removal. *In re Dependency of E.L.F.*, 117 Wn. App. 241, 245, 70 P.3d 163 (2003). The Department alleged that the three infants were dependent under RCW 13.34.030(6)(b) and/or RCW 13.34.030(6)(c).

RCW 13.34.060(b) provides that a child is dependent if the child has been abused or neglected, as defined by RCW 26.44.020(1), by a person legally responsible for that child's care. Neglect includes a failure to act "that evidences a serious disregard of consequences of such magnitude as to constitute a clear and present danger to a child's health, welfare, or safety." RCW 26.44.020(19).

Failing to protect one's child from danger can provide a basis for a finding of dependency under the "neglect" prong of RCW 13.34.060(b). *In Re Dependency of M.S.D.*, 144 Wn. App. 468, 480, 182 P.3d 978 (2008); *In re Dependency of S.M.H.*, 128 Wn. App. 45, 52, 115 P.3d 990 (2005). To prove its case against Rae under RCW 13.34.060(b), the Department did not have to establish that he personally abused his children. It could prevail by establishing that Rae knew that Taylor was abusing the boys and failed to intervene to protect them from his abuse.

RCW 13.34.030(6)(c) provides that a child is dependent if they have "no parent, guardian, or custodian capable of adequately caring for the child, such that the child is in circumstances which constitute a danger of substantial damage to the child's psychological or physical development." A dependency under RCW 13.34.030(5)(c) is not predicated on a finding of abuse or neglect. *In re Dependency of Schermer*, 161 Wn.2d 927, 946, 169 P.3d 452 (2007). The Department does not need to "stay its hand until actual damage to the endangered child has resulted." *Id.* at 951 (quoting *In re Welfare of Frederiksen*, 25 Wn. App. 726, 733, 610 P.2d 371 (1979)). To establish a dependency under this alternative theory, the Department again did not have to prove Rae abused the boys himself, just that he was incapable of protecting them from substantial damage.

In a dependency case, the Department bears the burden of proving its allegations by a preponderance of evidence at a fact-finding hearing to be held no later than 75 days from the date of the petition. RCW 13.34.110(1); RCW 13.34.070(1); JuCR 3.4(c). A parent may waive the right to this fact-finding hearing by stipulating or agreeing to the entry of an order of dependency. RCW

13.34.110(3)(a). Any such stipulation must be signed by the parent and is subject to approval by the court. RCW 13.34.110(3)(b). Before the court can enter a stipulated order of dependency, it must consider the Department's social study, the contents of which are mandated by RCW 13.34.430, to ensure that the order is consistent with the allegations in the dependency petition and the problems that necessitated the child's placement in out-of-home care. *Id.* The court may also sign the agreed order of dependency only if the parent or his attorney appears before the court to ensure it that the parent signed the order, understands his responsibility to participate in remedial services, understands the consequences of signing the order, including the legal effect of the admission that the child is dependent, and has "knowingly and willingly stipulated and agreed to and signed the order or orders, without duress, and without misrepresentation or fraud by any other party." RCW 13.34.110(3)(c)(i)-(iv). A parent may waive his presence at the in-court hearing for entry of a stipulated order of dependency by submitting it to the court through counsel. RCW 13.34.110(3)(c)(iv).

It is undisputed that the Department and Rae followed the procedure for stipulating to a finding of dependency. Rae explicitly stipulated that the factual allegations, as set out in the Department's petitions, were true and correct. He also stipulated that the children were dependent under RCW 13.34.030(6)(c). He agreed that "[a] manifest danger exists that the child will suffer serious abuse or neglect if the child is not removed from the home." He signed the stipulated order, waived his presence at its presentation, and submitted it to the court through counsel. The court entered this order 54 days after the Department filed its petition, well within the 75-day statutory deadline.

Rae's lawsuit against the Department alleges he did not commit any child abuse or neglect and that the Department conducted a negligent investigation, proximately causing a harmful placement decision affecting his three children. A negligent investigation claim is a narrow statutory cause of action that arises from the Department's duty under RCW 26.44.050 to investigate allegations of child abuse or neglect. *Tyner v. Dep't of Soc. & Health Servs.,* 141 Wn.2d 68, 82, 1 P.3d 1148 (2000). To prevail, the plaintiff must demonstrate the Department "gathered incomplete or biased information" that results in a harmful placement decision. *M.W.*, 149 Wn.2d at 602. A harmful placement decision includes removing a child from a nonabusive home. *Id.* The plaintiff must prove that the Department's negligent investigation was a proximate cause of the harmful placement decision. *McCarthy v. County of Clark*, 193 Wn. App. 314, 329, 376 P.3d 1127 (2016).

In his lawsuit, Rae alleges that the Department "ignor[ed] all evidence that showed [Rae] could not be responsible for any alleged abuse to the triplets," and made "factual misrepresentations during the investigation and/or the dependency proceedings that followed." He claims the Department's negligent and biased investigation, and not his own parental deficiencies, proximately caused the removal of his children from his home.

But Rae cannot dispute that the Department removed the children from an abusive home. In Rae's child custody case against Taylor, Rae obtained a judicial finding that Taylor had physically abused the children. And it is undisputed that the Department removed the children from Rae's care because he stated he lacked the capability of adequately caring for them under circumstances that

presented a substantial danger to their psychological or physical development. Given these undisputed facts, Rae cannot now claim that the Department's faulty investigation proximately caused the court to remove his children, rather than the abuse inflicted on the children by his former partner and his own inability to protect them from this abuse.

Rae relies on *Alishio v. Department of Social & Health Services*., 122 Wn. App. 1, 91 P.3d 893 (2004) to argue that collateral estoppel cannot bar his negligent investigation claim. In that case, the Department issued administrative findings that Alishio had neglected her son by allowing unsupervised contact with his uncle, an admitted child molester. *Id.* at 3. When Alishio sought a hearing to contest the findings, the Department claimed she was barred from challenging the finding of neglect based on an agreed order Alishio had signed in a separate dependency proceeding. *Id.* at 4. But the Department had not sought a dependency on the basis of neglect under former RCW 13.34.030(4)(b) (1999) and the mother had not stipulated to the fact of neglect. *Id.* The Department's dependency petition alleged that her son lacked a parent able to provide adequate care to him under former RCW 13.34.030(4)(c) and it was on this basis alone that Alishio stipulated to a dependency order. *Id.* at 4.

On appeal, Alishio argued that, in accepting the agreed dependency order, the trial court must have found in her favor on the issue of neglect, collaterally estopping the Department from reasserting neglect in a subsequent proceeding. *Id.* at 4-5. This court disagreed, reasoning that the parties deliberately avoided litigating the issue of neglect by agreeing to resolve the matter based on an alternative finding under subsection (6)(c). *Id.* at 6. The court further noted that

"the dependency order's silence on the issue of neglect makes it unclear whether the trial court actually decided the issue." *Id.* Thus, it held that collateral estoppel did not preclude the Department from alleging the mother had committed neglect.

Rae contends that, because his stipulation was based on the same statutory language as in *Alishio*, collateral estoppel should not apply here. App. Reply at 7. *Alishio*, however, is distinguishable. In that case, the mother was not alleging that the Department had improperly removed her son from her custody. The mother was challenging a finding of neglect, a factual issue to which she had not stipulated in the dependency proceeding.

Rae did not agree in the dependency proceeding that he had abused or neglected his children and the dependency did not resolve that issue. Under *Alishio*, he would not be estopped from litigating that issue. But Rae *did* stipulate that his children were in danger of "serious abuse or neglect if . . . not removed from the home." The court entered findings of fact consistent with this stipulation and the Department removed the children, not because Rae himself committed abuse or neglect, but because Rae admitted he was incapable of adequately protecting his children from harm.

Rae asks us to ignore the findings of fact to which he stipulated in the dependency case because, he claims, the Department coerced him into agreeing to the stipulated order of dependency. He argues he should be permitted to litigate whether he signed the order under duress, a factual issue not litigated in the dependency proceeding. We disagree.

The juvenile court cannot accept a stipulation of dependency unless the parent has "knowingly and willingly stipulated and agreed to and signed the order

or orders, *without duress*, and without misrepresentation or fraud by any other party." RCW 13.34.110(3)(c)(iv) (emphasis added). When the court accepted and signed the stipulated order of dependency, Rae in effect represented to the court that he was not under duress when he agreed to the order and the Department did not procure his signature through misrepresentation.

Moreover, we acknowledge that any parent in dependency proceedings faces the difficult choice of whether to challenge the Department's evidence at a fact-finding hearing or to stipulate to a dependency. However difficult Rae's decision was, it simply does not rise to the level of legal duress. Generally, a showing of duress requires proof of a wrongful act that compels or induces a person to enter a transaction involuntarily. *In re J.N.*, 123 Wn. App. 564, 577, 95 P.3d 414 (2004); *Pleuss v. City of Seattle,* 8 Wn. App. 133, 137, 504 P.2d 1191 (1972) (quoting RESTATEMENT (FIRST) OF CONTRACTS § 497 (Am. Law Inst. 1932)). A "threat to exercise a legal right made in good faith is neither duress nor coercion in law." *Pleuss*, 8 Wn. App. at 137. Even if we accept Rae's testimony as true, he has not identified any action by the Department other than, at most, a threat to exercise a legal right.

Rae suggests that, under RCW 13.34.130, the Department's threat to place his children in foster care was a wrongful act, given the agency's requirement to give priority to a relative placement with Rae's parents. But RCW 13.34.130 actually requires *the court*, not the Department, to give preference to a relative placement, and that particular statute applies only *after* a fact-finding hearing and a finding of dependency.

- 15 -

Rae acknowledges that the juvenile court initially placed his children with his elderly aunt and uncle but alleged they were unable to meet the needs of the children because the Department would not help them in obtaining medical resources. He alleges that the Department's failures led to the removal of the children and to the threat to separate them instead of placing them together with his parents.

But all shelter care placements are subject to court approval. *See* RCW 13.34.060(2) (court must place children at the shelter care stage with relatives only if they are able to meet the needs of the children placed in their care); RCW 13.34.065(5)(b) (court must find relative is willing and available to care for the children and able to meet their special needs); RCW 13.34.065(7)(a)(i) (court may modify initial shelter care placement only by finding a "change in circumstances"). *See also* Department Policy 4260.1.b.ii, Placement Moves (agency cannot make a placement change for children placed with relatives unless it has a court order allowing it to occur).[4] Any concerns Rae had regarding the Department's placements could have been addressed by the juvenile court authorized to make placement decisions.

Rae contends the Department had no basis for refusing to place his children with his parents. But the Department's refusal to agree to such a placement during shelter care is not unlawful. Rae's parents lived out of state, in Montana. The Department's authority to place any children in out-of-state care is limited by the ICPC and internal ICPC policies. Article III(d) of the ICPC, set out

---

[4] Wash. Dep't of Children, Youth, & Families Administrative Policy 4260 (Revised June 2022) available at https://www.dcyf.wa.gov/4000-child-welfare-services/4260-placement-moves.

in RCW 26.34.010, prohibits the Department from sending children into another state without the receiving state first agreeing to the placement and ensuring that the placement would not be contrary to the interests of the child. Article IV of the ICPC makes it illegal to send a child into another state in violation of the ICPC. Under Department policy 5601, children not covered by the Indian Child Welfare Act[5] can be placed out of state through the ICPC process only after a court finds them dependent.[6]

Facing these legal limitations and placement policies, the Department had the legal obligation to consider any suitable non-relative in-state placement for the children, including separate homes for the children if necessary, pending a fact-finding hearing. Rae presented no evidence that the Department refused to consider a suitable in-state relative placement that could meet the needs of all three boys. Indeed, Rae stipulated to the exact opposite: he agreed that the Department "made an effort to place the child with a relative known to the child and with whom the child has a relationship and a relative is not available or willing to care for the child and to meet any special needs of the child."

Rae also maintains the Department threatened to separate his three boys, and he felt compelled to agree to an order of dependency to ensure they stayed together. But circumstances may necessitate separating siblings, such as the lack of a suitable in-state placement capable of caring for three infants at the same

---

[5] Ch. 13.38 RCW.

[6] Wash. Dep't of Children, Youth, & Families Administrative Policy 5601 (Revised October 2014) available at https://www.dcyf.wa.gov/5600-interstate-compact-placement-children/5601-interstate-compact-placement-children-placed-out.

time.[7]  Rae presented no evidence that the Department refused a suitable in-state placement as a way to gain leverage in negotiations.  Rae was represented by counsel at the time he entered into the stipulated order of dependency, as was his right under RCW 13.34.090(1) and had the opportunity to raise any concern Rae had about overreach by the Department in the parties' negotiations.  There is no evidence any such concerns were ever raised with the Department or the court.

And by stipulating to an order of dependency under RCW 13.34.030(6)(c), Rae avoided the risk that the juvenile court would find that he personally committed child abuse, a finding that could have jeopardized his ability to regain custody of the children.  He also avoided the risk that the juvenile court would find he knew of, and failed to protect his children from, the abuse committed by Taylor.

Rae had significant procedural safeguards throughout the dependency process.  First, Rae had the right to a fact-finding hearing, at which the rules of evidence would have applied.  RCW 13.34.110(1).  Second, he had a right to a speedy determination within 75 days of when the Department filed the petition.  RCW 13.34.070(1); JuCR 3.4(c).  Third, Rae had the right to a hearing to contest any placement recommendation the Department made to the court.  Fourth, Rae had no obligation to waive his presence at the hearing at which the court entered the dependency order.  Finally, he was entitled to a statutory finding by the court that the agreed order was not the product of duress.

---

[7]  Under Department policy 4250.5.a.vii, a case worker must place siblings together unless "extraordinary circumstances" exist and a separate placement is approved by the case worker's supervisor and an area administrator. Wash. Dep't of Children, Youth, & Families Administrative Policy 4250 (Revised October 2019) available at https://www.dcyf.wa.gov/4000-child-welfare-services/4250-placement-out-home-and-conditions-return-home

Additionally, once the Department placed the boys in Montana with Rae's parents under the ICPC, Rae had a significant amount of time in which he could have moved to vacate the dependency order on the basis of duress. Under CR 60(b), a party may request the court to vacate an order or judgment based on numerous factors, including misrepresentation, misconduct of an adverse party, or the judgment being void. *See In re Marriage of Wilson*, 117 Wn. App. 40, 49, 68 P.3d 1121 (2003) (party seeking to vacate order based on duress arises under CR 60(b)(4)). Rae had ample opportunity to bring this issue before the court. *See Nielson,* 135 Wn.2d at 264-65 (the party against whom the doctrine is asserted must have had a full and fair opportunity to litigate the issue in the earlier proceeding). Rae chose not to do so.

Because the dependency order determined that Rae was unable to keep his children safe and this finding led the court to remove the children from his care, he cannot now claim that the Department's negligent investigation was the cause of their removal.

2.    Finality of Dependency Findings

Rae next argues that collateral estoppel does not apply because the dependency order was not a final judgment entered on the merits. We disagree.

Finality is normally "conclusively established by a judgment on the merits . . . by affirmation on appeal." *Chau v. City of Seattle,* 60 Wn. App. 115, 120, 802 P.2d 822 (1991). But absolute finality is not required for collateral estoppel. *Id.* Under this doctrine, a final judgment "'includes any prior adjudication of an issue in another action that is determined to be sufficiently firm to be accorded conclusive effect.'" *In re Dependency of H.S.*, 188 Wn. App. 654, 661, 356 P.3d

202 (2015) (quoting *Cunningham v. State*, 61 Wn. App. 562, 567, 811 P.2d 225 (1991)).

Washington courts have concluded that, for purposes of collateral estoppel, a juvenile court's dependency order is a final judgment on the merits. *H.S.*, 188 Wn. App. at 661; *see also Miles v. State*, *Child Protective Servs. Dep't*, 102 Wn. App. 142, 153, 6 P.3d 112 (2000) (an agreed order of dependency is final under collateral estoppel doctrine). Despite this case law, Rae argues that the agreed order of dependency was neither litigated nor final. He relies on several inapposite cases.

First, he points to *Lesley for Lesley v. Department of Social & Health Services.*, 83 Wn. App. 263, 921 P.2d 1066 (1996). In that case, parents whose child was removed after a caseworker mistook birthmarks for bruises, sued the Department for negligent investigation. The Department argued the parents were collaterally estopped from challenging the Department's investigation because they stipulated to a finding at a shelter care hearing that the child should stay in foster care until the court could determine whether the marks on the child were the result of an injury. This court rejected that argument because a shelter care order is not a final adjudication on the merits of the Department's allegations. *Id.* at 276.

A shelter care order, however, is distinct from a dependency order. A shelter care hearing is a "preliminary proceeding" during which a court merely determines where a child should temporarily reside "pending a dependency determination." *In re Dependency of R.H.*, 129 Wn. App. 83, 87, 117 P.3d 1179 (2005) (citing RCW 13.34.030(24)). Neither shelter care orders nor dependency

review orders are appealable as a matter of right. *In re Dependency of Chubb*, 112 Wn.2d 719, 724, 773 P.2d 851 (1989); *In re Dependency of J.E.R.C.*, 1 Wn. App. 2d 765, 771, n.2, 406 P.3d 1187 (2017).

Unlike a shelter care order, a disposition decision following a finding of dependency is an appealable order under RAP 2.2(a)(5) ("a party may appeal from only the following superior court decisions: (5) *Juvenile Court Disposition.* The disposition decision following a finding of dependency by a juvenile court . . . ."). *Chubb*, 112 Wn.2d at 722 (disposition decisions following a finding of dependency are appealable as a matter of right). In *Miles,* this court recognized the distinction between a shelter care order and a dependency order: "[t]he *Lesley* court properly did not apply collateral estoppel to a shelter care order that was not final or appealable. We properly apply collateral estoppel to a dependency judgment that *was* final and appealable." (citations omitted). 102 Wn. App. at 153 n. 18.

Rae relies on *In re Marriage of Murphy*, 90 Wn. App. 488, 952 P.2d 624 (1998) for the proposition that a stipulation, by its very nature, means that the legal or factual issues have not been litigated by the parties. *Murphy,* however, arose under a completely different statutory scheme. In that case, a father filed a dissolution petition in Ohio, seeking custody of his children. *Id.* at 492. The mother argued that the Ohio court lacked jurisdiction over the children because Ohio was not the children's home state. *Id.* The court denied the mother's motion to dismiss the petition for lack of jurisdiction. She then filed a petition in Washington, seeking custody of the children here. *Id.* Shortly thereafter, the mother entered into an agreement in the Ohio court resolving all issues relating to

the dissolution, including the custody of the children. *Id.* She stipulated that she consented to jurisdiction in Ohio. *Id.*

The mother later sought to convince a Washington court to retain jurisdiction, claiming she entered into the Ohio agreement under duress. *Id.* The trial court dismissed the mother's petition under the Uniform Child Custody Jurisdiction Act (UCCJA), 26.27 RCW, the stipulation entered in the Ohio case, and the fact the Ohio case had been filed first. *Id.* at 493. On appeal, this court concluded that Ohio did not acquire jurisdiction through the mother's stipulation to jurisdiction because subject matter jurisdiction is determined by statute, not by stipulation or agreement. *Id.* at 496.

The father separately argued that the mother was barred by collateral estoppel from relitigating in Washington any custody issues resolved in the Ohio proceeding. *Id.* at 497. The court held that under the UCCJA, a second state court has the authority to evaluate the jurisdiction of the first state court. *Id.* at 497. When the second court's inquiry "discloses [that] the jurisdictional questions [were] fully and fairly litigated and finally decided in the court which rendered the original judgment, the second court is precluded form reexamining the jurisdiction of the court rendering the original judgment." *Id.* at 497-98 (internal quotations omitted). The court concluded that the record was inadequate for it to determine if the jurisdictional issue was fully and fairly litigated and finally decided by the Ohio court. *Id.* It remanded the matter to the trial court to make this determination. *Id.* at 498-99.

Unlike stipulations to jurisdiction in matters relating to interstate child custody disputes, parties are statutorily permitted to stipulate to an order of

dependency in RCW 13.34.110. Moreover, the record here is more than adequate to conclude that the determinative fact of Rae's children's dependency status was fully and fairly litigated and finally decided by the juvenile court. *Murphy* has no applicability to this case.

Last, Rae relies on *Marquardt v. Fed. Old Line Ins. Co. (Mut.)*, 33 Wn. App. 685, 658 P.2d 20 (1983) and *Krikava v. Webber*, 43 Wn. App. 217, 716 P.2d 916 (1986) for the proposition that courts "refuse to apply collateral estoppel to issues resolved via agreement or agreed orders." In *Marquardt*, this court concluded that "collateral estoppel should not be applied to judgments of dismissal, even when based on settlement agreements, since the parties could settle for myriad reasons not related to the resolution of the issues they are litigating." 33 Wn. App. at 689. The court in *Krikava* similarly concluded collateral estoppel did not apply where the prior litigation had been dismissed based on a settlement agreement, indicating that the issue was not litigated. 43 Wn. App. at 222.

Neither of these cases involves a stipulation to facts—they deal only with cases resolved through settlement agreements and dismissed as a part of that settlement. Unlike a settlement, a stipulation admits the existence of a fact. Stipulated facts are generally binding on the parties and the court. *Ross v. State Farm Mut. Auto. Ins. Co.*, 132 Wn.2d 507, 523, 940 P.2d 252 (1997). Under RCW 13.34.110(3)(c)(iii), the entry of an agreed order of dependency is an admission and "shall have the same legal effect as a finding by the court that the child is dependent by at least a preponderance of the evidence." In choosing to admit that their child is dependent, the parent has, by operation of law, litigated the

issue. The juvenile court's dependency order is a final judgment on the merits and binding on Rae.

### 3. Injustice

Finally, Rae argues that application of the collateral estoppel doctrine here would result in injustice. Because Rae has identified no procedural irregularities in the dependency proceeding, we disagree.

While courts should not apply collateral estoppel when it would work an injustice, this "component is generally concerned with procedural, not substantive irregularity." *Christensen*, 152 Wn.2d at 309. The "party against whom the doctrine is asserted must have had a full and fair opportunity to litigate the issue in the earlier proceeding." *Id.* at 307. "There is nothing inherently unfair about [precluding relitigation of an issue] provided the party has the full and fair opportunity to litigate, there is no significant disparity of relief, and all the other requirements of collateral estoppel are satisfied." *Id.* at 313.

Rae presented no evidence that he lacked a full and fair opportunity to litigate whether his children were properly removed from his care. With the assistance of counsel, Rae repeatedly waived his right to contest this fact and conceded that he was unable to care for the children and they faced a serious threat of harm should they remain in the home.

While there are strong public policy reasons to prevent the Department from threatening parents with the separation of their children, this policy consideration is accounted for in the structure of the dependency proceedings in this state. Under RCW 13.34.110(3)(c)(iv) the court is required to inquire and establish on the record that the parent is stipulating without duress. It does not

work an injustice to preclude Rae's claims of coercion here because the prior dependency litigation provided an opportunity for him to address any threats from the Department. Rae had the opportunity to contest the children's removal or to argue to the juvenile court that he was being coerced into stipulating by Department threats. He never did. Because Rae had a full and fair opportunity to litigate these issues, it does not result in injustice to apply collateral estoppel here.[8]

Affirmed.

WE CONCUR:

_Andrus, C.J._

_Smith, A.C.J._

---

[8] Because we affirm the dismissal of Rae's complaint on the basis of collateral estoppel, we need not reach the issues of judicial estoppel or superseding cause.